SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## State v. Wilbert Hannah (A-74/75-19) (084052)

**January 4, 2021 -- Reargued March 31, 2021 -- Decided August 18, 2021**

**ALBIN, J., writing for the Court.**

The Court considers whether Wilbert Hannah was denied a fair trial because critical evidence was withheld from the jury that supported his third-party-guilt defense. Hannah has presented two alternative grounds for post-conviction relief to the Court -- either the evidence in question was newly discovered and would have altered the outcome of his trial, or his counsel had the critical evidence in his file and was derelict in not using it, rendering him constitutionally ineffective.

In August 1993, Hannah and co-defendant William LaCue were indicted for murder and other offenses. The State presented testimony that shortly after midnight on June 7, 1993, Jersey City police officers responded to a report of gunshots and found the lifeless bodies of Angel Salazar and Luis Flores in a parked car. In the driver's seat lay Salazar with a gunshot wound to his left temple. Directly behind him in the back seat lay Flores with three gunshot wounds to the right side of his face and a fourth to his right shoulder.

The central pillar of the State's case was the testimony of LaCue. As part of a cooperation agreement with the State, LaCue gave three recorded statements to the police. In the first two, he told the police that he alone killed Salazar and Flores. In his third statement and again later in his trial testimony, LaCue stated that Hannah, who was also known by the name of Rabb, shot Salazar from the front passenger seat. The State also introduced testimony from Rosa Flores, Salazar's wife and Flores's sister, and Hazel Forrester, who had been in a relationship with Hannah. Rosa Flores testified that a person who identified himself as Rabb spoke to Salazar on the phone at around 11 p.m. on June 6, and that Salazar and Flores left after the call. Hazel Forrester testified that Hannah appeared at around 11:30 p.m. at the apartment where she lived with her sister, Arlene, that she overheard him telling her sister that he had killed a person named Fred (Salazar's nickname), that Hannah told her that he had killed someone, that Fred had previously called the apartment several times, asking for Rabb, and that the phone number on a bloody piece of paper recovered from Salazar's pocket after the shooting was her sister's. No DNA or fingerprint evidence linked Hannah to the victims' car.

1

Hannah testified that he, LaCue, and Maurice Thomas were heroin dealers, operating independently, in the same area of Jersey City. Among their drug sources were two New York suppliers, Salazar and Flores. Hannah testified that, on the evening of June 6, 1993, LaCue and Thomas were talking to the New York suppliers near their car while Hannah walked away to chat with a woman across the street. He heard gunshots and began to run. According to Hannah, Thomas and LaCue were the gunmen, and Thomas framed Hannah.

Certain evidence was never presented at trial. First, a six-page report prepared by Lieutenant Charles Redd of the Hudson County Prosecutor's Office provided a narrative of the homicide investigation and Thomas's importance to that investigation. The Redd Report revealed that investigators found in the victims' car a pager number listed to "Rabb." When that number was called, however, it was Thomas who responded to the page. As a result, Thomas was interviewed. Before his arrival at the Prosecutor's Office, Thomas made an anonymous telephone call to Jersey City Police Communications and claimed that Rabb and LaCue were responsible for the killings. During the interview, he told investigators that "he did not know the victims" or LaCue and that he was with his girlfriend, Arlene Forrester, and her sister, Hazel Forrester, at the time of the shootings. Thomas eventually conceded that he was not truthful when he denied knowing LaCue, and some of his statements about Hazel and Arlene were inconsistent. After Thomas left the interview, the police received another anonymous telephone call, stating that Hannah had confessed to killing the victims, not only to Thomas but also to the caller and Hazel Forrester. Afterwards, Hazel and Arlene were interviewed by the police, and Arlene admitted that she was the anonymous caller.

Because the defense did not call Lieutenant Redd as a witness, the jury never learned that Salazar and Flores had Thomas's pager number in their possession when they were murdered, nor did they hear that LaCue had left a message on Thomas's pager, asking to speak with him, the day after the murders.

The jury also did not hear the testimony of Thomas's mother, Mary Jones, who had information that not only inferentially implicated her son in the murders, but also provided a motive for her son to frame Hannah. Jones acknowledged that her son and Hannah were drug dealers who sometimes worked together, and she testified to a number of comments Thomas made to her that suggested he had participated in the killings and planned to frame Hannah for them. The court rejected defense counsel's argument that the testimony of Mary Jones was admissible under the co-conspirator's exception to the hearsay rule. Defense counsel did not argue that Thomas's admissions to his mother constituted statements against interest under N.J.R.E. 803(c)(25), nor did the court address that alternate ground for the admissibility of Jones's testimony. In her summation remarks, the prosecutor told the jury, "[T]here is not a stitch, a scintilla, a scintilla, a bit, an ounce, a piece of evidence, that links [Thomas] to that murder."

2

The Appellate Division affirmed, determining that Thomas's statements to Jones were not admissible as statements against interest. The Court denied certification.

In his first petition for PCR, Hannah asserted ineffective assistance of counsel by his trial and appellate attorneys, claiming, among their deficiencies, their failure to adequately present the case for the admission of the testimony of Thomas's mother. The PCR court denied the petition without an evidentiary hearing; after the Appellate Division remanded for a hearing, the PCR court again denied relief. The Appellate Division affirmed; the Court denied certification, and the federal district court denied Hannah's habeas corpus petition.

Hannah's copy of the case file, including trial discovery and transcripts, was lost during a lockdown at Trenton State Prison, and Hannah received a replacement copy. Hannah averred that, for the first time, he observed the Redd Report, which disclosed that Thomas responded to a pager number found in the victims' car.

In his second PCR petition, Hannah moved for a new trial based on newly discovered evidence. In January 2008, the PCR court denied Hannah's petition without an evidentiary hearing. In February 2008, Hannah's former PCR counsel certified that, to his recollection, the Redd Report did not appear in the file provided to him by the Public Defender's Office. In February 2009, the Appellate Division reversed the second PCR court and remanded for an evidentiary hearing.

Before the evidentiary hearing, Hannah filed a motion to recuse the PCR judge because he had served as the Hudson County Prosecutor when that office opposed Hannah's PCR application. The PCR judge declined to disqualify himself and denied Hannah post-conviction relief. The Appellate Division held that the PCR judge should have recused himself and remanded for a new hearing before a different judge.

At the new evidentiary hearing in 2014, the new PCR judge denied Hannah relief, making factual findings that (1) "it is probable that [Hannah's] counsel was in possession of the [Redd] report" and that (2) "it [is] highly unlikely that the report was suppressed at trial," as well as legal findings the evidence would not have changed the outcome at trial. The Appellate Division affirmed, but nevertheless remanded for a hearing to "address whether the pager was newly discovered evidence." The Court denied certification.

In August 2018, a fourth evidentiary hearing was conducted. The court found that Hannah had not satisfied the three prongs of the standard for a new trial based on newly discovered evidence. The Appellate Division affirmed on the ground that Thomas's statements were not admissible as statements against interest. In so holding, the appellate court seemingly accepted that Hannah did not have the Redd Report, despite the findings of the third PCR court, which were affirmed on appeal. The Court granted certification. 242 N.J. 502 (2020).

3

**HELD:** Based on the record, Hannah has established that his counsel rendered constitutionally deficient representation and that, but for counsels' errors, there is a reasonable probability that the outcome of the trial would have been different. The Court reverses the judgment of the Appellate Division denying Hannah post-conviction relief, vacates his judgment of conviction, and remands for a new trial.

1. Hannah's argument that the information in the Redd Report was newly discovered evidence was adjudicated at an evidentiary hearing before the third PCR judge, who found, based on the record before him, that "it is probable that [Hannah's] counsel was in possession of the [Redd] report" and "highly unlikely that the report was suppressed at trial." The fourth PCR judge should have adhered to the finality of that decision. For purposes of this appeal, the Court accepts that counsel at trial, on direct appeal, and at the first PCR hearing had the Redd Report and somehow overlooked it. (pp. 32-33)

2. The question that remains is whether each of those counsel rendered ineffective assistance of counsel by not utilizing the Redd Report, and whether errors by trial counsel contributed to the court's findings that Thomas's mother's testimony was inadmissible. Stressing that Hannah's ineffective-assistance argument has not received a meaningful review and that there is a voluminous record from the trial and PCR evidentiary hearings, the Court considers Hannah's claim to determine whether he was denied a fair trial and whether his conviction constitutes a fundamental injustice. Rules 3:22-4 and -5 permit review of otherwise barred claims to prevent a fundamental injustice, which occurs when an error or violation played a role in the determination of guilt. (pp. 33-37)

3. In a criminal case, the accused is guaranteed the effective assistance of counsel by the Sixth Amendment of the United States Constitution, Strickland v. Washington, 466 U.S. 668, 684-85 (1984), and Article I, Paragraph 10 of the New Jersey Constitution, State v. Fritz, 105 N.J. 42, 58 (1987). The test for determining whether counsel failed to provide the effective assistance required by the Federal and State Constitutions is set forth in Strickland and Fritz: first, a defendant must demonstrate that counsel's representation was deficient -- that counsel's representation fell below an objective standard of reasonableness -- and second, he must show a reasonable probability that the result of the proceeding would have been different but for counsel's deficiencies. (pp. 37-39)

4. A defendant has a constitutional right to present a complete defense, including the right to introduce evidence of third-party guilt. In this case, defense counsel's trial strategy was to advance an effective and credible third-party-guilt defense that Thomas -- not Hannah -- committed the crime. The success of that trial strategy required counsel merely to raise a reasonable doubt about Hannah's guilt. Third-party-guilt evidence is admissible so long as the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case, and third-party statements against penal interest are generally admissible where the proffered evidence draws a direct connection between the third party and the commission of the crime. (pp. 39-40)

4

5. In light of the factual findings of the third PCR judge, the Court accepts that Hannah's trial counsel had the Redd Report. The exclusion of that evidence must be considered in conjunction with the other evidence withheld -- the testimony of Thomas's mother. The mother's damning testimony inculpating her son came in two forms -- her recounting statements against interest made by Thomas and her observations of Thomas involved in drug activities seemingly linked to the murdered drug dealers. The mother's testimony did not get before the jury, however, because of Hannah's counsel's failure to present the proper evidentiary argument for the testimony's admissibility -- an error magnified and multiplied by errors made by the trial court, the PCR courts, and the Appellate Division. The Court explains that the mother's testimony about Thomas's statements against penal interest were admissible under N.J.R.E. 803(c)(25); that trial counsel's failure to identify that rule to the trial court cannot be ascribed to strategy; that the Appellate Division's determination on direct appeal that N.J.R.E. 803(c)(25) required the statement both to inculpate Thomas and exculpate Hannah was mistaken; and that the prosecutor unfairly exploited the derelictions of defense counsel when -- despite her knowledge of the Redd Report and the testimony by Thomas's mother -- she told the jury in summation that there was not "a scintilla" or "a piece of evidence" linking Thomas to the murder. (pp. 40-49)

6. Applying the Strickland/Fritz test, the Court finds that Hannah has shown both that counsel's representation fell below an objective standard of reasonableness and that, to a degree of reasonable probability, the outcome of the trial would have been different but for counsel's mistakes, which were magnified by mistakes made by the trial court and the prosecutor and perpetuated through various rounds of PCR proceedings. Counsel's deficiencies deprived Hannah of his constitutional right to present a complete and credible third-party-guilt defense. One important factor in analyzing whether the prejudice from counsel's ineffective performance denied Hannah a fair trial is the strength of the State's case; here, the State presented far from overwhelming evidence of Hannah's guilt. Among other examples, the Court cites LaCue's credibility issues and the timing discrepancies in the other witnesses' accounts. The Court also reviews the evidence that Hannah should have been able to introduce to support his version of events -- evidence that undoubtedly lay at the heart of his right to present a complete defense and whose admission was necessary to ensure the basic fairness of his trial. (pp. 49-52)

7. The combined errors in this case constitute a fundamental injustice that denied Hannah a fair trial. But for counsel's errors -- combined with those made by the trial court and prosecutor -- there is a reasonable probability that, had the jury heard the withheld evidence, the outcome of the trial would have been different. The issue is not whether the State presented sufficient evidence for the jury to return a guilty verdict, but whether Hannah was denied the opportunity to present a full defense. The passage of time alone cannot bar relief to a defendant deprived of a fair trial. (pp. 52-53)

**The judgment of the Appellate Division is REVERSED. Hannah's judgment of conviction is VACATED, and the matter is REMANDED for a new trial.**

5

**CHIEF JUSTICE RABNER concurs in full** with the Court's opinion and writes separately to ask the Committee on Evidence to examine whether N.J.R.E. 803(c)(25) should be amended. Noting that the federal counterpart to Rule 803(c)(25) contains an additional requirement beyond those of the New Jersey rule -- to be admissible, a statement against interest must not only be against the declarant's interest but must also be "supported by corroborating circumstances that clearly indicate its trustworthiness," Fed. R. Evid. 804(b)(3) -- Chief Justice Rabner explains that the requirement serves to assure both the prosecution and the accused that the Rule will not be abused and that only reliable hearsay statements will be admitted under the exception. Chief Justice Rabner recommends that the Committee on Evidence consider whether a corroboration requirement should be added to N.J.R.E. 803(c)(25) for the same reason. The Chief Justice does not suggest that such a requirement would have had an effect in this case.

**JUSTICE SOLOMON, dissenting,** reviews the evidence presented and writes that it undercuts several defense claims, notably that Rosa Flores did not know who "Rabb" was; that Salazar was shot from outside the car; that the Redd Report contained key information otherwise unavailable to the jury; and that the Redd Report and certain excluded testimony was purely exculpatory. In Justice Solomon's view, defense counsel cannot be considered deficient in failing to use the Redd Report because it implicated defendant in the felony murder, robbery, and weapons charges he faced. Justice Solomon adds that there is no reasonable probability that the result of the proceeding would have been different had the report been used because the Redd Report contains no evidence that undermines defendant's felony murder conviction. For the same reason that defendant is unable to show ineffective assistance of counsel here, Justice Solomon writes, he is unable to demonstrate that the rules barring his PCR request must be relaxed to prevent a fundamental injustice. In Justice Solomon's view, it is unclear why, after more than two decades, defendant's ineffective assistance of counsel claim premised on counsel's failure to use the Redd Report was not raised on direct appeal or during defendant's first or second PCR and was instead raised after Thomas had died. Justice Solomon finds that the State presented overwhelming evidence of defendant's guilt and that there is no clear reason to disturb the jury's verdict.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and PIERRE-LOUIS join in JUSTICE ALBIN's opinion. CHIEF JUSTICE RABNER also filed a concurrence. JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.**

State of New Jersey,

Plaintiff-Respondent/Cross-Appellant,

v.

Wilbert Hannah,
a/k/a Rabe,

Defendant-Appellant/Cross-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| January 4, 2021 | August 18, 2021 |
| Reargued | |
| March 31, 2021 | |

Andrew R. Burroughs, Designated Counsel, argued the
cause for appellant/cross-respondent (Joseph E. Krakora,
Public Defender, attorney; Andrew R. Burroughs, on the
briefs).

Ednin D. Martinez, Assistant Prosecutor, argued the
cause for respondent/cross-appellant (Esther Suarez,
Hudson County Prosecutor, attorney; Ednin D. Martinez,
on the briefs).

Daniel A. Finkelstein, Deputy Attorney General, argued
the cause for amicus curiae Attorney General of New
Jersey (Gurbir S. Grewal, Attorney General, attorney;
Daniel A. Finkelstein, of counsel and on the brief).

1

This appeal comes to us from Wilbert Hannah's fourteen-year odyssey through the post-conviction relief process and his repeated efforts to overturn his 1994 felony murder convictions. The essential issue is whether Hannah was denied a fair trial because critical evidence was withheld from the jury that supported his third-party-guilt defense.

The trial turned largely on the testimony of William LaCue, a co-defendant, who struck a favorable plea agreement with the State and became the prosecution's star witness. LaCue testified that he and Hannah shot and killed two drug dealers and stole their drugs. But LaCue gave varying contradictory stories to the police and his account of Hannah's involvement in the shooting conflicted with the forensic evidence presented by the State. Hannah testified that the second gunman was Maurice Thomas, who was involved in the local drug trade. The jury rejected Hannah's third-party-guilt defense and convicted him of felony murder of the two drug dealers.

But the jury did not hear the full story. A series of fatal trial errors committed by Hannah's defense counsel -- errors compounded by the trial court and exploited by the prosecutor -- kept from the jury evidence that likely would have altered the outcome of the verdict. The jury did not hear that

investigators found in the pocket of one of the victims a bloody piece of paper bearing a pager number and that when investigators called that number, Thomas responded.  The jury did not hear Thomas's mother's testimony that her son made various statements inferentially implicating himself in the murders, that he plotted to frame Hannah, that he split drug monies with LaCue, and that he apparently came into possession of the heroin taken from the dead drug dealers.

The ineffective assistance of Hannah's various counsel has evaded a meaningful review, despite many post-conviction hearings and appeals.  The purpose of a PCR hearing is to provide a procedure to uncover mistakes that may have caused an unjust result.  State v. Hess, 207 N.J. 123, 144-45 (2011).  The legal missteps and errors and the resulting prejudice to Hannah are now before us.

Even the best system of justice will result in some wrongful convictions.  We cannot remedy every wrongful conviction, but we must remedy those that come to our attention.  "[P]ost-conviction relief [is] the last line of defense against a miscarriage of justice."  State v. Nash, 212 N.J. 518, 526 (2013).

We hold that, based on the record before us, Hannah has established that his counsel rendered constitutionally deficient representation and that, but for counsels' errors, there is a reasonable probability that the outcome of the trial

would have been different.  See Strickland v. Washington, 466 U.S. 668, 694 (1984), and State v. Fritz, 105 N.J. 42, 58 (1987).  We therefore reverse the judgment of the Appellate Division denying Hannah post-conviction relief, vacate his judgment of conviction, and remand for a new trial consistent with this opinion.

I.

A.

On August 25, 1993, a Hudson County Grand Jury indicted Hannah and LaCue on two counts of purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) or (2); two counts of felony murder, N.J.S.A. 2C:11-3(a)(3); two counts of armed robbery, N.J.S.A. 2C:15-1; and two counts of possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).

The State's Case

The State presented testimony that shortly after midnight on June 7, 1993, Jersey City police officers responded to a report of gunshots near the intersection of Clinton Avenue and Sackett Street in Jersey City.  There, in a parked gray two-door Buick, they found the lifeless bodies of Angel Salazar and Luis Flores.  In the driver's seat lay Salazar with a gunshot wound to his left temple.  Directly behind him in the back seat lay Flores with three gunshot wounds to the right side of his face and a fourth to his right shoulder.

4

A pathologist for the State Medical Examiner's office stated that the bullet that killed Salazar entered the left side of his head at a downward, approximately 45-degree angle while he was likely sitting upright -- a finding consistent with a shooter firing from a standing position outside the car.[1] No gunpowder residue was found on his skin, and the bullet that killed Salazar was found still lodged in his head. The shots that struck the right side of Flores's head, killing him, were fired at a slightly upward angle and at close range -- evidenced by powder burns.

The central pillar of the State's case was the testimony of LaCue. As part of a cooperation agreement with the State, LaCue pled guilty to charges of aggravated manslaughter and armed robbery in exchange for the dismissal of the murder and felony murder charges against him.

After LaCue's arrest for the murders, he gave three recorded statements to the police. In the first two statements, he told the police that he alone killed Salazar and Flores. Those two false statements gave way to LaCue's third statement, which implicated Hannah in the murders. LaCue's statement as

---

[1] Indeed, a police investigation report revealed that the driver's side window was punctured with a bullet hole and the window had partially collapsed into the car. No testimony, however, was elicited on that point.

well as his testimony placed Hannah in the front passenger seat when Hannah allegedly shot Salazar -- a claim at odds with the forensic evidence.

LaCue gave the following account at trial. On June 6, 1993, Hannah, who was also known by the name of Rabb,[2] arranged to purchase approximately 2,200 "bags" of heroin from New York drug dealers that evening in Jersey City. Hannah, however, had no intention of paying for the heroin. With LaCue as his accomplice, Hannah hatched a plan to shoot the drug dealers and steal the drugs. At around 10:30 p.m., Hannah and LaCue retrieved two guns from Hannah's house and then awaited the arrival of the drug dealers.

Shortly afterwards, a grey two-door car appeared with two men, the driver (later identified as Salazar) and a front seat passenger (later identified as Flores). Flores exited the car and took a seat behind Salazar. LaCue got into the back of the car with Flores, and Hannah took the front passenger's seat next to Salazar. They drove around a block in Jersey City, and then Hannah told Salazar to park the car. There, Salazar handed a package of drugs to Hannah and asked for the money. At that point, Hannah and LaCue drew their guns, and the two drug dealers pled for their lives. As Salazar reached for the

---

[2] We have adopted the trial testimony's spelling of "Rabb" rather than the spelling of that name in the caption.

6

driver's door, apparently intending to exit, Hannah told him to keep his hands on the steering wheel. Then, according to LaCue, Hannah shot Salazar twice, and LaCue shot Flores twice. LaCue stated that Hannah fired his gun within six inches of the right side of Salazar's head. The two shooters then exited the car and ran.

As they ran, Hannah handed his gun to LaCue and told him to get rid of both firearms. LaCue brought the guns to his girlfriend's house, where he gave the weapons to his brother with instructions to dispose of them.

LaCue later was arrested for the killings. After he gave his third statement to the police -- the one he stuck with at trial -- LaCue called his brother and told him to bring the murder weapons to the police station. The shell casings found in Salazar's car matched the two handguns LaCue's brother turned over to the police.

Rosa Flores testified that on June 6, 1993, she was living with Salazar (her husband) and Flores (her brother) in an apartment in Brooklyn, New York. She stated that around 11 p.m., she picked up the telephone and a person who identified himself as "Q" asked to speak with Salazar. She had been instructed by Salazar only to take a call from a person named Rabb. She responded to the caller, "we don't know any Q." Then a person who identified himself as Rabb got on the line and spoke with Salazar. After the call, Salazar and Flores left,

7

telling her that they had to pick up some money owed to them and that they would return in fifteen to twenty minutes.

Hazel Forrester testified that on June 6, 1993, at around 11:30 p.m., Hannah appeared at the apartment where she lived with her sister, Arlene. Hazel had been in a relationship with Hannah for about two months. Present in the apartment that evening was an overnight visitor -- Maurice Thomas, Arlene's boyfriend. According to Hazel, Arlene opened the apartment door, and Hazel overheard Hannah telling her sister that he had killed a person named Fred (Salazar's nickname). Hannah then entered Hazel's bedroom and told her that he had killed someone and would have to leave for a while. Hannah stayed through the night and left in the morning. Hazel also testified that Fred had previously called the apartment several times, asking for Rabb. Hazel identified a number on a bloody piece of paper recovered from Salazar's pocket as her sister's telephone number.

On June 30, 1993, the FBI arrested Hannah in Florida on a warrant for the murders of Salazar and Flores. Investigator Vincent Doherty of the Hudson County Prosecutor's Office and a Jersey City Police sergeant flew down to Florida to bring Hannah back to New Jersey. Investigator Doherty testified that while waiting in the airport for the return flight home, Hannah explained the events of June 6, 1993.

8

Hannah told Investigator Doherty that, on June 6, at LaCue's request he called his drug connection in New York. That evening, two Puerto Rican men arrived in Jersey City in a car with New York plates. The men made eye contact with Hannah and LaCue, who followed them to a nearby street, where the car parked. One of the men stepped out of the front of the car and entered the rear of the vehicle. LaCue followed closely behind him.

Hannah remained on the sidewalk "rapping with a girl" and drinking a soda.[3] After the girl left, Hannah heard gunshots and ran. As he was running, LaCue called out to him, and they met in an alleyway where Hannah found LaCue ejecting rounds from an automatic weapon. Hannah yelled, "why did you do that? You are going to have the New York people come after us now." Hannah and LaCue then left the alleyway. Hannah went to the home of his girlfriend, Hazel, but she was sleeping, so he walked to a nearby park "to sort things out." He decided to flee, fearing that "the people from New York" would be looking for him in retaliation for the killings.

---

[3] Investigator Doherty testified that Hannah stated that he was drinking from a can of C&C Cola. The police found in Salazar and Flores's vehicle two soda cans, one a Mountain Dew and the other a ShopRite brand soda. Salazar's fingerprints were recovered from the Mountain Dew can; no fingerprints were lifted from the other can. Hannah testified that Doherty misunderstood him, and that, in fact, LaCue was the one drinking a soda that night.

Upon their return to New Jersey, Hannah refused to give the officers a recorded statement without an attorney present. No DNA or fingerprint evidence linked Hannah to the victims' car.

### The Defense Case

Hannah testified that he, LaCue, and Thomas were heroin dealers, operating independently, in the same area of Jersey City. Among their drug sources were two New York suppliers, Salazar and Flores, who did business in Brooklyn and in Jersey City. On the evening of June 6, 1993, LaCue told Hannah that he had run out of his cache of heroin. After he learned that Hannah had not been in contact with Salazar and Flores recently, LaCue reached out directly to the New York suppliers. At Hannah's home, LaCue paged the suppliers repeatedly until he finally spoke with one of them. Hannah was in another room and did not participate in or listen to the conversation.

Afterwards, Hannah and LaCue walked to an area of Jersey City where, for a couple of hours, Hannah "hustl[ed]" with others, including Thomas, selling drugs. According to Hannah, Thomas -- known as Big Mo-T despite his small stature -- "controlled the drugs" in the area, and Hannah, who was proficient in martial arts, acted as a "bodyguard" for him. Hannah and Thomas

10

were "associates" but sold their own drugs and kept the proceeds from their own sales.

When the New York suppliers arrived, Hannah, LaCue, and Thomas followed their car on foot for about a block until it parked and one of the men exited. They engaged in small talk with him, and then Hannah walked away to chat with a woman across the street. As Hannah left the group, LaCue stood by the car's passenger side and Thomas by its driver's side.

Hannah's conversation with the woman lasted about ten minutes, and as he watched her walk away, he heard gunshots. He instinctively ducked and checked to see if he had been struck by a bullet, and then ran. As he ran, he heard LaCue call out to him, "yo, yo." LaCue soon caught up to him and nudged him to keep running. When they reached a certain point, LaCue pulled out a gun and began removing rounds. Hannah asked LaCue what happened, but LaCue tersely responded, "[d]on't worry about it."

As Hannah walked back toward the scene, he saw Thomas standing in front of Hazel Forrester's apartment, and then heard people screaming about the shooting and saying that "the New York boys" would be "coming over here," apparently to seek revenge.

Hannah then walked around the city, worrying that the associates of the dead New York suppliers would conclude that he was involved in the shooting.

11

As he contemplated his next move, he returned home. When he later learned from friends that a group of "Colombians" were coming to kill him, he fled to Florida to stay with relatives.

During his testimony, Hannah made several points. He stated that at the time of the killings of Salazar and Flores, several pagers were registered to him, and Thomas had one of those pagers. He also stated that Hazel lied when she testified that he went to her apartment the evening of the shooting. He opined that she fabricated her testimony because of her fear of Thomas.[4] He further noted that two weeks before the shooting, drug money had been stolen from him. Although Thomas pointed the finger of blame at someone within their group, Hannah later learned from Thomas's mother that her son was the one who had committed the theft.

**What The Jury Did Not Hear**

**1. The Redd Report**

Post-conviction relief proceedings in this case revealed important details potentially incriminating Thomas in the murder of Salazar and Flores and supporting Hannah's third-party-guilt defense. Those details, although disclosed in discovery, were never elicited by defense counsel during trial.

---

[4] Indeed, Hazel testified that she was more afraid of Thomas than Hannah.

See infra pp. 22-23, 32. Lieutenant Charles Redd of the Hudson County Prosecutor's Office prepared a six-page report that provided a narrative of the homicide investigation and Thomas's importance to that investigation.

The Redd Report revealed that investigators found in the victims' car a pager number listed to "Rabb." When that number was called, however, it was "Maurice Thomas A.K.A. 'Big Mo T' who responded to the page." As a result, Thomas was invited to the offices of the Hudson County Prosecutor's homicide squad to be interviewed. Before his arrival, Thomas made an anonymous telephone call to Jersey City Police Communications and claimed that Rabb and LaCue were responsible for the killings. During the interview, he told investigators that "he did not know the victims" or LaCue and that he was with his girlfriend, Arlene Forrester, and her sister, Hazel Forrester, at the time of the shootings.

Pressed by the investigators, Thomas conceded that he was not truthful when he denied knowing LaCue. According to the Redd Report, Thomas then claimed that Hannah appeared at the apartment where he was residing on the morning of June 7 and admitted that he and LaCue committed the murders. He told the investigators that Arlene and Hazel were asleep at the time of Hannah's admission.

After Thomas left the interview, the police received another anonymous telephone call, stating that Hannah had confessed to killing the victims, not only to Thomas but also to the caller and Hazel Forrester. Afterwards, Hazel and Arlene were interviewed by the police, and Arlene admitted that she was the anonymous caller.

When interviewed again, Thomas retracted his earlier statement that Hazel and Arlene were not present during Hannah's confession to the crime. At a further interview, Thomas told investigators that LaCue had placed a message on his pager.

Because the defense did not call Lieutenant Redd as a witness, the jury never learned that Salazar and Flores had Thomas's pager number in their possession when they were murdered, nor did they hear that LaCue had left a message on Thomas's pager, asking to speak with him, the day after the murders.

### 2. Thomas's Mother's Testimony

The jury also did not hear the testimony of Thomas's mother, Mary Jones, who had information that not only inferentially implicated her son in the murders, but also provided a motive for her son to frame Hannah. Defense counsel attempted to call Thomas's mother as a witness, but the State objected to the admissibility of her testimony. The court conducted a Rule 104

14

hearing,[5] out of the presence of the jury, at which Mary Jones testified to the following.

Jones acknowledged that her son and Hannah were drug dealers who sometimes worked together. On the morning of June 7, 1993, Thomas called her and said, "this kid LaCue [has] just killed two drug suppliers, and I don't know what to do because I think the police . . . have my name and my beeper number." Thomas told his mother that he "had beeped the two drug suppliers" and "made arrangements" with them to bring drugs, and that "[h]e was afraid that his number was going to be found in [their] car."

Thomas then had a series of communications with his mother. That afternoon, he told her that "he just found out that . . . Rabb had helped LaCue"; later that evening, at her home, he stated that "he had talked to the cops"; the next day he called and said that he was cooperating with the authorities, that her line would be tapped, and that "he wanted the police to get [Hannah] . . . that he was setting him up."

On the morning of June 9, Thomas came to his mother's house with Arlene Forrester. While at her house, she heard her son tell Arlene that

---

[5] N.J.R.E. 104(a)(2) provides that, in deciding the admissibility of evidence, "[t]he court may hear and determine such matters out of the presence or hearing of the jury."

15

[Hannah] would have to take the weight.  In order to get [Hannah] off his back he would have -- [Hannah] would have to be gotten rid of.  The only way he know to get rid of [Hannah] is to have [Hannah] take the weight for the one of the murders that was committed.

Thomas's mother explained that her son was involved in a scheme to rob drugs and money from one of Hannah's associates, but that Hannah did not know about the role he played.  Thomas, according to his mother, "was afraid that [Hannah] would find out about it."  Thomas related to his mother that he had a conversation with Hannah about the killing of the drug suppliers -- "that he told [Hannah] that [Hannah's] name was being kicked around, that the Colombians were looking for him, and he told [Hannah] it was best for him to leave the city."

Over the following days, her son and Arlene stayed over her house, and she observed them counting $10,600 in drug monies, $5,000 of which was earmarked for LaCue.  Thomas told his mother "that he had to find LaCue . . . He had to get a package [of drugs] from LaCue."  Thomas's mother testified that the drugs taken from the "two suppliers ended up in the hands of [her] son Maurice."  According to his mother, Thomas told "his girlfriend that they had to move them out fast.  This is what the police was looking for, and the name of the drugs was Gotta Have It."

16

The investigation report of Investigator Lawrence Mullane of the Jersey City Police Department revealed that Salazar and Flores were selling a particular brand of Heroin -- "Gotta Have It."

The court rejected defense counsel's argument that the testimony of Mary Jones established that Thomas and LaCue conspired to rob and kill Salazar and Flores and that Thomas's statements made to his mother were therefore admissible under the co-conspirator's exception to the hearsay rule. See N.J.R.E. 803(b)(5). The court also based its decision on N.J.R.E. 403, finding that the admission of Jones's testimony would be misleading and confusing.[6]

Defense counsel did not argue that Thomas's admissions to his mother constituted statements against interest under N.J.R.E. 803(c)(25), nor did the court address that alternate ground for the admissibility of Jones's testimony.

B.

The Prosecutor's Summation

In her summation remarks, the prosecutor told the jury that no evidence connected Thomas with the murder of Salazar and Flores: "[T]here is not a

---

[6] N.J.R.E. 403, in pertinent part, provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury."

17

stitch, a scintilla, a scintilla, a bit, an ounce, a piece of evidence, that links this Mo-T, Maurice Thomas, Big Mo-T, whatever you want to call him, nothing to link him to that murder, and if it came in, I missed it." In addition, the prosecutor argued to the jury that LaCue had no reason not to implicate Thomas in the murders, stating "he's not friends with Mo-T. He's not associates with Mo-T." In listening to those remarks, the jury did not know that Salazar and Flores had Thomas's pager number in their car when they were shot or that, after they were killed, Thomas and LaCue allegedly split approximately $10,000.

## C.

## Conviction and Sentence

The jury convicted Hannah of two counts of felony murder, two counts of armed robbery, and one count of possession of a weapon for an unlawful purpose, and acquitted him of the remaining charges. On November 18, 1994, the court sentenced Hannah to consecutive terms of life imprisonment with a thirty-year period of parole ineligibility on each of the felony murder convictions. The court merged the armed robbery and weapons possession convictions into the felony murder convictions.

II.

A.

Direct Appeal

On direct appeal, the Appellate Division held that the trial court did not abuse its discretion in disallowing the testimony of Thomas's mother, finding that her proffered testimony was hearsay that (1) did not fall within the co-conspirator's exception to the hearsay rule and (2) "was irrelevant, confusing, and misleading" under N.J.R.E. 401 and 403. The Appellate Division also rejected Hannah's plain error argument that the testimony was admissible under N.J.R.E. 803(c)(25) on the ground that Thomas had made statements against his interest to his mother. The Appellate Division reasoned that N.J.R.E. 803(c)(25) was inapplicable because Thomas's statements to his mother could not "be regarded as inculpating [Thomas] while exculpating defendant" and because some of the statements "contain[ed] two layers of hearsay." This Court denied Hannah's petition for certification. State v. Hannah, 153 N.J. 217 (1998).

First Petition for Post-Conviction (PCR)

In his first petition for PCR, Hannah asserted ineffective assistance of counsel by his trial and appellate attorneys, claiming, among their deficiencies, their failure to adequately present the case for the admission of the testimony

of Thomas's mother. The PCR court denied the petition without an evidentiary hearing. The Appellate Division affirmed the PCR court's determination that Hannah's attorneys were not constitutionally ineffective in addressing the admissibility of the mother's proffered testimony but remanded for an evidentiary hearing on an unrelated issue. Before the remand proceeding, this Court denied certification. State v. Hannah, 174 N.J. 41 (2002). On remand, the PCR court again denied relief, the Appellate Division affirmed, and this Court again denied certification, State v. Hannah, 178 N.J. 453 (2004), and the United States District Court for the District of New Jersey denied Hannah's habeas corpus petition in 2006.

## Second Petition for Post-Conviction Relief

Hannah's copy of the case file, including trial discovery and transcripts, was lost during a lockdown at Trenton State Prison. In 2007, the Hudson County Prosecutor's Office forwarded to Hannah a replacement copy. Hannah averred that, for the first time, he observed the Redd Report, which disclosed that Thomas responded to a pager number found in the victims' car.

In his second PCR petition, Hannah moved for a new trial based on newly discovered evidence, claiming that the Prosecutor's Office did not disclose exculpatory evidence. In January 2008, the PCR court denied Hannah's petition without an evidentiary hearing, stating that Hannah failed to

20

establish that the State withheld exculpatory evidence or that any such new evidence supported a claim of innocence. In February 2008, Hannah's former PCR counsel certified that, to his recollection, the Redd Report did not appear in the file provided to him by the Public Defender's Office.

In February 2009, the Appellate Division reversed the second PCR court and remanded for "an evidentiary hearing to determine whether a <u>Brady</u>[7] violation occurred" and whether Thomas's pager number found in the victims' car constituted "newly discovered evidence."

Second Evidentiary Hearing

At the evidentiary hearing in November 2009, Hannah's trial counsel testified that although he did not recall ever reading the Redd Report, his recollection of what occurred fifteen years earlier was "to put it charitably, dim." He added that if, during trial, he had information revealing that Thomas had contact with the victims, he would have used it.

Hannah's first PCR counsel also testified that he did not remember seeing the Redd Report until Hannah forwarded it to him in 2007. He stated that the report was either not in the file sent to him by the Public Defender's

---

[7] <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

21

Office or that he overlooked the report. The importance of the information in the report, however, was clear to him because "it bolster[ed] Hannah's story that [Thomas] was the shooter."

Hannah testified that he did not see the Redd Report until the Hudson County Prosecutor's Office forwarded discovery to him in 2007.

The assistant prosecutor who tried Hannah's case testified that although she could not specifically recall whether the Redd Report was turned over to the defense, she never in her career knowingly or willfully withheld a discoverable document.

Before the evidentiary hearing, Hannah filed a motion to recuse the PCR judge because he had served as the Hudson County Prosecutor from 1997 to 2002, a period during which his office opposed Hannah's application for post-conviction relief. The recusal motion was renewed at the conclusion of the hearing. The PCR judge declined to disqualify himself from the case and denied Hannah post-conviction relief.

The Appellate Division held that the PCR judge should have recused himself and remanded for a new evidentiary hearing before a different judge.

Third Evidentiary Hearing

At the new evidentiary hearing in 2014, Hannah testified consistently with his previous sworn statements that he did not have the Redd Report

22

before or during his trial, his direct appeal, or his first PCR petition. Moreover, his trial, direct appeal, first PCR, and PCR direct appeal attorneys testified that they had no memory of seeing the Redd Report in defendant's case file, and both Hannah's trial and direct appeal attorneys stated that, had they known about the Redd Report, they would have used it. Finally, the trial prosecutor again testified that she had never knowingly withheld discovery from a defendant.

The new PCR judge -- the third to preside over post-conviction proceedings in this case -- denied Hannah relief, reasoning that Hannah did not meet the standard for the grant of a new trial, based either on a theory of newly discovered evidence or ineffective assistance of counsel. The PCR judge's ruling included these findings: (1) "it is probable that [Hannah's] counsel was in possession of the [Redd] report"; (2) "it [is] highly unlikely that the report was suppressed at trial"; (3) "in the event the Redd Report was not available to [Hannah], it would have in no way affected the outcome of the trial"; (4) "the information that the Redd Report contained was information that [Hannah] would have been made aware of through [Thomas's mother's] testimony"; (5) "any information contained in the Redd Report was not new or unique to the trial"; and (6) "there is no merit to [Hannah's] assertion that the trial would have had a different outcome but for his attorney's actions."

In May 2017, in an unpublished opinion, the Appellate Division affirmed substantially for the reasons stated by the PCR judge. The Appellate Division nevertheless remanded for yet another evidentiary hearing to "address whether the pager was newly discovered evidence." This Court denied certification. State v. Hannah, 231 N.J. 145 (2017).

Fourth Evidentiary Hearing

In August 2018, a fourth evidentiary hearing was conducted by the fourth PCR judge assigned to this case. Hannah again testified that he did not receive the Redd Report until 2007.

The PCR judge and defense counsel reached agreement on one issue: the Appellate Division's remand order was "confusing." There was also agreement that the Appellate Division's reference to a "pager" related to a piece of paper containing telephone or pager numbers found in the victim's car. Defense counsel argued that a pager number on the piece of paper required context, and that context was provided by the Redd Report, which revealed that when the number was called, Thomas responded.

Although the PCR judge concurred that the Redd Report had to be considered in determining the merits of Hannah's petition, he concluded that Hannah had not satisfied the standard for a new trial based on newly discovered evidence, as set forth in State v. Carter, 85 N.J. 300, 314 (1981).

24

The PCR judge found that Hannah met prong one of the three-prong Carter test: the pager number on the piece of paper -- the number to which Thomas responded -- was "material to the case." But Hannah failed to satisfy prongs two and three, in the judge's view, because the connection between the pager number and the call to Thomas could have been discovered by reasonable diligence by counsel before trial (prong two) and because the evidence, even if presented at a new trial, would probably not result in a change of the jury's verdict (prong three).

B.

In an unpublished opinion in November 2019, the Appellate Division affirmed the denial of defendant's PCR petition on newly discovered evidence grounds but for reasons seemingly at odds with its 2017 opinion. The Appellate Division's 2017 opinion affirmed the factual findings of the third PCR judge, which evidently included a finding that "it is probable that [Hannah's] counsel was in possession of the [Redd] report." In its 2019 opinion, however, the Appellate Division seemingly accepted the argument that Hannah did not have the Redd Report. The 2019 panel asserted that the testimony of Thomas's mother did not reveal that the "police found the [pager] number in Salazar's pocket, called it, and reached Thomas." The panel concluded that the record did not support "the PCR judge's finding that the

25

evidence [that the police called Thomas's pager from a number found in the dead drug dealers' car] was discoverable by reasonable diligence beforehand."

The Appellate Division, however, held that Hannah failed to satisfy the third prong of the newly discovered evidence test. The panel rejected the argument that had the jury known about the recovery of Thomas's pager number on a piece of paper in the drug dealer's pocket (the information in the Redd Report), it would have led the jury to find "his third-party-guilt defense credible" and would have "acquitted him." The panel came to this conclusion, in part, because of its belief that the testimony of Thomas's mother, which presumably supported the third-party-guilt defense, "was inadmissible as a statement against interest or a statement by a co-conspirator." The panel construed the statement against interest exception to the hearsay rule, N.J.R.E. 803(c)(25), as limited to such statements introduced "against an accused in a criminal action [and] only if the accused was a declarant." The panel reasoned that the testimony of Thomas's mother "concerned statements attributed to Thomas, who was not the accused" and were therefore inadmissible.

As will be more fully discussed, the appellate panel clearly misunderstood the meaning of the statement-against-interest rule. The Attorney General agreed at oral argument that a statement against interest

26

under N.J.R.E. 803(c)(25) is admissible regardless of whether the declarant is the accused.

In the end, the Appellate Division denied Hannah's petition for a new trial based on newly discovered evidence.

C.

We granted Hannah's petition for certification, which raised three issues: (1) whether the Appellate Division's misinterpretation of N.J.R.E. 803(c)(25) led to the erroneous conclusion that Thomas's mother's exculpatory testimony was inadmissible hearsay; (2) whether the mother's recounting of her observations of her son's criminal conduct was non-hearsay testimony; and (3) whether the Appellate Division's misinterpretation of the statement-against-interest rule resulted in the mistaken conclusion that "Hannah failed to establish that the missing Redd Report was newly discovered evidence." See 242 N.J. 502 (2020).

We also granted the State's cross-petition, which raised the following issue: whether the Appellate Division erred in "concluding that information regarding a pager number and its connection to Maurice Thomas was not

reasonably discoverable before Mr. Hannah allegedly obtained the 'Redd Report' for the first time."  See 242 N.J. 505 (2020).

Additionally, we granted the motion of the New Jersey Attorney General to participate as amicus curiae.

After hearing oral argument on January 4, 2021, we requested supplemental briefing to address two issues:  whether trial counsel was ineffective if the Redd Report was disclosed in discovery and whether the Court could consider the ineffective-assistance-of-counsel claim "at this time." In requesting further briefing, we acknowledged that Hannah had suggested, alternatively, an ineffective-assistance-of-counsel claim "[d]uring the course of this litigation."

## III.

## A.

Hannah contends that whether the vital information in the Redd Report constitutes newly discovered evidence -- evidence withheld from the defense at trial -- or whether his counsel possessed the Report and was constitutionally derelict in not presenting the information to the jury in support of his third-party-guilt defense, the result is the same:  he suffered a manifest injustice. That Thomas responded to the pager number on the bloody piece of paper in Salazar's pocket, Hannah argues, established the "relevancy nexus" for the

28

admission of the testimony of Thomas's mother. That testimony, Hannah posits, was admissible because it recounted her observations of her son and his statements against interest, which linked him to the drug dealers, their deaths, and his efforts to frame Hannah. Without the mother's testimony, according to Hannah, the jury was left with Hannah's "uncorroborated self-serving testimony" that Thomas was LaCue's accomplice in the killings. Hannah asserts that he was denied the opportunity to present a complete defense and therefore denied a fair trial.

Hannah also submits that the third PCR judge wrongly denied his ineffective-assistance-of-counsel claim based on the flawed notion that the Redd Report was not "new information" that would have altered the outcome of the trial, and that the Appellate Division simply affirmed on this point without any elaboration. He insists that the ineffective-assistance-of-counsel claim is a live claim, never reviewed by this Court, and that our Rules of Court governing post-conviction relief do not require this Court to acquiesce to a fundamental injustice when no court has addressed the issue in a meaningful way, citing State v. Nash, 212 N.J. 518, 546-47 (2013).

### B.

The State contends that the Appellate Division erred in concluding that the defense could not have discovered through reasonable diligence the

information in the Redd Report: that Thomas responded to the call placed by the police to the pager number found in the drug dealers' car. The State maintains that the defense received the Redd Report and that, even if it did not, the information about the pager number was available by cross-referencing Thomas's statements to the police, his mother's testimony, and investigation reports disclosed in discovery.

Additionally, the State asserts that Hannah's newly discovered evidence and ineffective-assistance-of-counsel claims fail because the evidence of his guilt was overwhelming and the information in the Redd Report would not have altered the outcome of the trial and because the testimony of Thomas's mother was not admissible. The State maintains that Thomas's statements to his mother "were not inculpatory of Thomas and at the same time exculpatory of [Hannah]," a necessary prerequisite, it says, for statements against interest under N.J.R.E. 803(c)(25). It also claims that his mother's observations of her son's involvement in narcotics transactions were not relevant to the murder of the drug dealers.

The State also asserts that Hannah's ineffective-assistance-of-counsel claim is not cognizable because the issue was fully litigated and decided by both the PCR court and the Appellate Division. On the merits of that issue, the State alleges that even if Hannah's counsel possessed the Redd Report, the

Report was not helpful to the defense, and the decision not to use it was part of counsel's trial strategy. Last, the State submits that the grant of a new trial twenty-seven years after the conviction would severely prejudice the State considering the death of some witnesses and the unavailability of others.

The arguments of the Attorney General largely mirror those of the State.

IV.

A.

The tortuous post-conviction procedural path of this case has included a series of hearings conducted by multiple judges, a raft of appeals, and a number of missteps and errors -- all combining to delay a final adjudication of the issues within a reasonable timeframe. In the ordinary course, post-conviction proceedings should not span fourteen years; final review of a case should not occur twenty-seven years after a conviction. But a core feature of our system of justice is that the passage of years will not render a fundamental injustice beyond correction.

The heart of Hannah's argument is that he was denied a meaningful opportunity to present a complete and credible third-party-guilt defense that Maurice Thomas was the second gunman and that Thomas framed him. He could not effectively advance that defense, he says, because the jury did not hear testimony that when the police called a pager number found on a bloody

31

piece of paper in the pocket of one of the murdered drug dealers, it was Maurice Thomas who responded to the call. That is the information contained in the Redd Report. Also withheld from the jury was the testimony of Thomas's mother that inferentially connected Thomas to the drug dealers and their murders. Hannah argues that the Redd Report provided the necessary nexus for the admission of that testimony.

### B.

Hannah has presented two alternative claims to this Court -- either the information in the Redd Report was newly discovered evidence that would have altered the outcome of the trial or his counsel had the Redd Report in his file and was derelict in not using it, rendering him constitutionally ineffective.

We first conclude that the newly discovered evidence argument was adjudicated at an evidentiary hearing before the third PCR judge who made factual findings based on witness testimony -- findings that were entitled to deference from the Appellate Division. See State v. S.S., 229 N.J. 360, 374 (2017); State v. Elders, 192 N.J. 224, 244 (2007). The third PCR judge relied on testimony from Hannah's trial counsel, direct appeal counsel, and PCR counsel, all of whom did not recall seeing the Redd Report but, based on the passage of time, could not say definitively it was not in the file. The assistant prosecutor testified that she did not have a specific recollection of the Redd

Report but that she never knowingly withheld discoverable evidence. No one disputes that the Prosecutor's Office provided the Redd Report to Hannah in 2007 when he lost his file -- an act hardly suggestive of a plot to suppress evidence. Hannah consistently testified that he had not seen the Report before 2007.

With that record before him, the third PCR judge found that "it is probable that [Hannah's] counsel was in possession of the [Redd] report" and "highly unlikely that the report was suppressed at trial." The Appellate Division affirmed that factual finding, determining that the Redd Report was not newly discovered evidence, and we denied certification. The fourth PCR judge should have adhered to the finality of that decision.

For purposes of the appeal before us, we therefore accept that counsel at trial, on direct appeal, and at the first PCR hearing had the Redd Report in their files and somehow overlooked it. All three attorneys testified that the Redd Report was an important piece of evidence to buttress Hannah's third-party-guilt defense and that, had they seen it, they would have used it at trial, on direct appeal, and on PCR.

The question that remains is whether each of those counsel rendered ineffective assistance of counsel by not utilizing the Redd Report and whether

33

errors by trial counsel contributed to the court's findings that Thomas's mother's testimony was inadmissible.

C.

To be sure, throughout the PCR process, Hannah's various attorneys have mainly focused on the issue of newly discovered evidence -- relying on the assumption that the Prosecutor's Office did not transmit in discovery the Redd Report. At the third PCR hearing, Hannah's counsel argued that issue exclusively. As already indicated, the third PCR judge determined that defense counsel likely had the Redd Report. The PCR judge nevertheless touched on the ineffective-assistance-of-counsel issue, even if somewhat dismissively. He noted that Hannah "argue[d] that trial counsel was ineffective for failing to offer the Redd Report to counter [Thomas's mother's] testimony and to cross-examine the State's witnesses." The judge then perfunctorily concluded that Hannah suffered no prejudice because the Redd Report did not contain "new information" and therefore the failure to use the Report could not have resulted in a different trial outcome.

After hearing argument on the newly discovered evidence issue, on which we granted certification, we requested further briefing and argument on whether Hannah was denied effective assistance of counsel. We now conclude that, throughout the many PCR proceedings, this issue has not received a

34

meaningful review at the PCR trial or appellate level. We will not remand for yet another evidentiary hearing and further prolong the fourteen-year saga of PCR review. We have a voluminous record from the trial and PCR evidentiary hearings. No procedural bar prevents this Court from reviewing the ineffective-assistance-of-counsel claim to determine whether Hannah was denied a fair trial and whether his conviction constitutes a fundamental injustice.

D.

Our jurisprudence makes clear that our Rules of Court governing post-conviction relief petitions and proceedings do not render our courts "powerless to correct a fundamental injustice." Nash, 212 N.J. at 547. Although a defendant is "generally barred from presenting a claim on PCR that could have been raised at trial or on direct appeal, R. 3:22-4(a), or that has been previously litigated, R. 3:22-5," those rules do not "require[] this Court to acquiesce to a miscarriage of justice." Id. at 546.

At the time of Hannah's first and second PCR petitions, Rule 3:22-4 stated that

> "[a]ny ground for relief not raised in a prior proceeding . . . is barred from assertion . . . unless the court . . . finds . . . (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would

35

be contrary to the Constitution of the United States or the State of New Jersey."

See State v. Martini, 187 N.J. 469, 481 (2006) (alteration and first three omissions in original). Thus, Rule 3:22-4 permitted judicial review to correct a fundamental injustice or to provide relief for a claim of constitutionally ineffective assistance of counsel.[8]

Additionally, we have held that "Rule 3:22-5's bar to review of a prior claim litigated on the merits 'is not an inflexible command'" and must yield to a fundamental injustice.[9] Nash, 212 N.J. at 547 (quoting State v. Franklin, 184 N.J. 516, 528 (2005)). A fundamental injustice occurs "when the judicial system has denied a 'defendant with fair proceedings leading to a just outcome' or when 'inadvertent errors mistakenly impacted a determination of guilt or otherwise wrought a miscarriage of justice.'" Id. at 546 (quoting State v. Mitchell, 126 N.J. 565, 587 (1992)). To demonstrate a fundamental

---

[8]  Indeed, the current version of Rule 3:22-4 explicitly states that fundamental injustice includes ineffective assistance of counsel. R. 3:22-4(a)(2). Rule 3:22-4(b), which addresses second and subsequent petitions for PCR, had not been adopted at the time Hannah filed his second PCR petition. Rule 3:22-4 was amended to include subparagraph (b) in 2010.

[9]  Rule 3:22-5 provides that "[a] prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding . . . or in any appeal taken from such proceedings."

36

injustice, a defendant must show "that an error or violation 'played a role in the determination of guilt.'" Id. at 547 (quoting Mitchell, 126 N.J. at 587).

We now turn to whether Hannah was denied the effective assistance of counsel.

V.

A.

In a criminal case, the accused is guaranteed the effective assistance of counsel by the Sixth Amendment of the United States Constitution, Strickland v. Washington, 466 U.S. 668, 684-85 (1984), and Article I, Paragraph 10 of the New Jersey Constitution, State v. Fritz, 105 N.J. 42, 58 (1987). See State v. Gideon, 244 N.J. 538, 549-50 (2021). The proper functioning of the adversarial system and the fundamental right to a fair trial are dependent on counsel performing at a level that ensures a defendant an "ample opportunity to meet the case of the prosecution." State v. Pierre, 223 N.J. 560, 577 (2015) (quoting Strickland, 466 U.S. at 685). "Counsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland, 466 U.S. at 688. "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on

37

as having produced a just result." Pierre, 223 N.J. at 577 (quoting Strickland, 466 U.S. at 686).

The familiar test for determining whether counsel failed to provide the effective assistance required by our Federal and State Constitutions is set forth in Strickland and Fritz:  first, a defendant must demonstrate that counsel's representation was deficient -- that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 687-88; Fritz, 105 N.J. at 52, and "[s]econd, he must show a reasonable probability that the result of the proceeding would have been different but for counsel's deficiencies," State v. Timmendequas, 161 N.J. 515, 598 (1999).  See Strickland, 466 U.S. at 694; Fritz, 105 N.J. at 52.

Although "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, a failure to present available evidence to support an obvious defense will not be characterized as a reasonable trial strategy, see Pierre, 223 N.J. at 566.  For example, the failure to present available alibi witnesses to testify that the defendant was at a place other than where the crime occurred at the time charged in the indictment could not be ascribed as a reasonable strategy.  Id. at 565-66.

We next turn to whether defendant was denied the right to present his third-party-guilt defense through the dereliction of his trial counsel and the errors of the trial court.

B.

A defendant has a constitutional right to present a complete defense, including the "right to introduce evidence of third-party guilt." State v. Cope, 224 N.J. 530, 551 (2016) (quoting State v. Cotto, 182 N.J. 316, 332 (2005)). In this case, Hannah asserted third-party guilt as a defense. LaCue admitted his role in the murders. The jury had to decide the identity of the second shooter. Hannah took the stand, denying involvement in the murders and placing Thomas and LaCue at the drug dealers' car moments before the shooting. Defense counsel argued in summation that Thomas and LaCue were the killers. Earlier, he had attempted to admit the testimony of Thomas's mother, which related her son's connection to the murdered drug dealers. In short, counsel's trial strategy was to advance an effective and credible third-party-guilt defense that Thomas -- not Hannah -- committed the crime. The success of that trial strategy required counsel merely to raise a reasonable doubt about Hannah's guilt.

Third-party-guilt evidence is admissible so long as "the proof offered has a rational tendency to engender a reasonable doubt with respect to an

39

essential feature of the State's case."  State v. Perry, 225 N.J. 222, 238 (2016) (quoting Cotto, 182 N.J. at 332); see State v. Fortin, 178 N.J. 540, 591 (2004); State v. Sturdivant, 31 N.J. 165, 179 (1959).  The doubt cast on the State's case must be based on "specific evidence linking the third-person to the crime" or to the victim.  Timmendequas, 161 N.J. at 620.  "[T]hird-party statements against penal interest" are generally admissible where "the proffered evidence [draws] a direct connection between the third party and the commission of the crime."  State v. Koedatich, 112 N.J. 225, 300-01, 311 (1988).  Third-party-guilt evidence is admissible "even if there is no evidence linking another specific suspect to the crime," provided the evidence tends to show that a person other than the defendant committed the crime.  See Perry, 225 N.J. at 238-39 (emphasis added).

## C.

In light of the factual findings of the third PCR judge, we accept that Hannah's trial counsel had the Redd Report -- had the information that investigators found a pager number on a bloody piece of paper in the pocket of Salazar, who lay dead in his car with a bullet in his head, and that when they dialed that pager number, Thomas returned the call.  The investigators' call to

40

the pager Thomas answered occurred just hours after the discovery of the drug dealers' bodies.

The importance of that information, as part of the overall third-party-guilt strategy, is self-evident. The defense simply could have called Lieutenant Redd to testify that the pager number was dialed, and Thomas responded. The information buttressed Hannah's testimony that Thomas was the killer, and it was the pathway toward the admission of Thomas's mother's testimony implicating her son. Significantly, too, the information refuted the prosecutor's summation remarks that "there is not a stitch, a scintilla, a scintilla, a bit, an ounce, a piece of evidence, that links this Mo-T, Maurice Thomas . . . to that murder." Defense counsel raised no objection to those misleading remarks that distorted, if not misrepresented, evidence in the prosecutor's own file.

Hannah's trial counsel testified that if he had the Redd Report, he overlooked the information, which he unreservedly admitted buttressed the third-party-guilt defense. Hannah's direct appeal counsel and first PCR counsel also testified to the critical importance of the Redd Report in advancing the defense of third-party guilt. The failure to use the Redd Report and to call Lieutenant Redd to the stand cannot be ascribed to a reasonable

41

defense strategy.[10] The first prong of <u>Strickland</u>/<u>Fritz</u> is clearly established -- trial counsel was constitutionally deficient in failing to introduce evidence to support his third-party-guilt strategy.

The full extent of that prejudice can only be measured when compared to the other evidence withheld -- the testimony of Thomas's mother.

D.

The finding of Thomas's pager number in the pocket of Salazar heightened the relevance of the testimony of Thomas's mother in buttressing Hannah's third-party-guilt defense. The mother's damning testimony inculpating her son came in two forms -- her recounting statements against interest made by Thomas and her observations of Thomas involved in drug activities seemingly linked to the murdered drug dealers. The mother's testimony did not get before the jury, however, because of Hannah's counsel's failure to present the proper evidentiary argument for the testimony's admissibility -- an error magnified and multiplied by errors made by the trial court, the PCR courts, and the Appellate Division.

---

[10] The State suggests that, had Lieutenant Redd testified regarding the pager number found in the victims' car, the prosecutor would have called Thomas as a rebuttal witness. But that argument is suspect because the State had the opportunity to call Thomas and did not, perhaps for good reason, given Thomas's multiple inconsistent statements to investigators.

42

We start with N.J.R.E. 803(c)(25), which provides that a statement against interest is admissible if

> at the time of its making [the statement was] so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.

The rationale for this exception to the hearsay rule "derives from 'the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably' and that, accordingly, 'statements that so disserve the declarant are deemed inherently trustworthy and reliable.'" Rowe v. Bell & Gossett Co., 239 N.J. 531, 558 (2019) (quoting State v. Brown, 170 N.J. 138, 148-49 (2001)).

The test for the admissibility of a statement under N.J.R.E. 803(c)(25) is "whether, in the context of the whole statement, the particular remark was plausibly against the declarant's penal interest, even though it might be neutral or even self-serving if considered alone." Id. at 558-59 (quoting State v. Nevius, 426 N.J. Super. 379, 394 (App. Div. 2012)). "The declarant, however, need not be a party to the action in which the statement is admitted," nor must the declarant be unavailable. Ibid. The rule requires "only that the statement

43

'so far subjected (the declarant) to a . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.'" State v. Abrams, 140 N.J. Super. 232, 235 (App. Div. 1976) (quoting Evid. R. 63(10), the predecessor to N.J.R.E. 803(c)(25)), aff'd, 72 N.J. 342, 370 (1977). "The rule does not require that each discrete part of the statement imply involvement in a crime." Ibid.

A statement against interest is clearly admissible "if the declarant has admitted his involvement in the crime either directly, or indirectly." State v. White, 158 N.J. 230, 244-45 (1999) (citations omitted). It is admissible also "if it exculpates a defendant," provided that the statement is against the "penal interest" of the declarant. Id. at 244 (quoting Report of the New Jersey Supreme Court Committee on Evidence (Mar. 1963)).

The Appellate Division panel in the appeal before us clearly had a mistaken understanding of the statement-against-interest rule. It held that a statement against interest could be introduced only "against an accused in a criminal action [and] only if the accused was a declarant." From that clearly erroneous interpretation of the rule, the panel came to the clearly erroneous conclusion that the testimony of Thomas's mother was inadmissible because it "concerned statements attributed to Thomas, who was not the accused." An interpretive analysis that misconceives the law must be rejected. See Nicholas

44

v. Mynster, 213 N.J. 463, 478 (2013) ("We do not defer to interpretative conclusions by the trial court or Appellate Division that we believe are mistaken.").

All in all, we conclude that Thomas made multiple statements against interest to his mother -- a seemingly reliable source -- in the hours and days following the murders of Salazar and Flores.

E.

At the Rule 104 hearing, Thomas's mother provided the following testimony. On the morning that the police found the bodies of Salazar and Flores, Thomas told her that he "had beeped the two drug suppliers" and "made arrangements" with them to bring drugs, and that "[h]e was afraid that his number was going to be found in [their] car."

Thomas also told his mother: (1) he had earlier schemed to rob Hannah of drugs and money and that he feared Hannah would "find out about it"; (2) he had to get "rid of" Hannah, "to get [Hannah] off his back," and "to have [Hannah] take the weight for the one of the murders that was committed"; (3) "he wanted the police to get [Hannah]," and "that he was setting him up"; (4) he informed Hannah "that the Colombians were looking for him" and that "it was best for him to leave the city"; and (5) "he had to find LaCue" and "get a package [of drugs] from him." Additionally, Thomas's mother overheard her

45

son tell his girlfriend, Arlene, "they had to move [drugs called Gotta Have It] out fast" because "[t]his is what the police was looking for." The prosecutor's file confirmed that the dead drug suppliers had been peddling a brand of heroin of the same name.

Each of those statements made by Thomas to his mother is a statement against Thomas's penal interest. The statements describe Thomas doing business in the drug world with the dead drug suppliers; stealing money and drugs from Hannah; scheming to "set[] him up", "to get rid of" of him, and to have him "take the weight" for one of the murders; and obstructing justice by encouraging Hannah to flee the jurisdiction, even while Thomas was cooperating with the police. Additionally, in her home, Thomas's mother observed her son and Arlene counting thousands of dollars, and evidently overheard her son say of the $10,600 of drug monies, LaCue's cut would be $5,000.

Each statement so far subjected Thomas to criminal liability "that a reasonable man in his position would not have made the statement unless he believed it to be true." See Abrams, 140 N.J. Super. at 235 (quoting Evid. R. 63(10)). And those statements, at least, "indirectly" implicated him in the murders of Salazar and Flores. See White, 158 N.J. at 244-45.

Yet, Hannah's trial counsel did not argue for the admission of that testimony based on the statement-against-interest rule. Such a gross oversight -- the failure to point out to the court the applicable rule to support the admission of critical evidence -- cannot be ascribed to trial strategy. Indeed, counsel's dereliction, in part, deprived the jury of the evidence necessary to consider the full scope of the defense of third-party guilt.

On direct appeal, the Appellate Division mistakenly believed that the admissibility of a statement against interest under N.J.R.E. 803(c)(25) required the statement both to inculpate Thomas and exculpate Hannah. Each statement, however, was admissible if it "so far tended to subject [Thomas] to . . . criminal liability," see N.J.R.E. 803(c)(25) or if "in the context of the whole statement, the particular remark was plausibly against [Thomas's] penal interest," Rowe, 239 N.J. at 558-59. Moreover, the statements -- particularly when combined with the information in the Redd Report -- met the test for relevance because they were offered in support of the defense of third-party guilt. Last, the most inculpatory statements made by Thomas were not -- as the appellate panel suggested -- subject to "two layers of hearsay." Thomas's mother heard the words straight from his mouth and recited them in sworn testimony at the Rule 104 hearing.

## F.

Here, the jury was not just deprived of hearing from Lieutenant Redd that Thomas's pager number was found in the pocket of one of the dead drug dealers or from Thomas's mother that her son made multiple statements connecting him to those dealers and the name-brand drugs they were selling. The prosecutor told the jury in summation that there was not "a scintilla" or "a piece of evidence" linking Thomas to the murder. That statement, at best, was misleading, considering what the prosecutor knew. She had the Redd Report in her file and heard Thomas's mother's testimony at the <u>Rule</u> 104 hearing.

As we recently said in <u>State v. Garcia</u>, "[a]lthough the prosecutor is free to discuss the direct and inferential evidence presented at trial," she cannot present an argument she knows to be untrue. 245 N.J. 412, 435-36 (2021). The prosecution apparently made a strategic decision not to elicit testimony that Thomas answered the pager number found on a piece of paper in the pocket of Salazar, and Hannah's trial counsel evidently overlooked that evidence supporting the third-party-guilt defense. A fair reading of the Redd Report would lead a reasonable person to conclude that there was "a scintilla" of evidence or "a piece of evidence" linking Thomas to the vehicle of the murdered drug dealers. Additionally, there is the testimony of Thomas's mother connecting her son to the dead drug dealers. "That otherwise

48

trustworthy and reliable evidence may be deemed inadmissible, for one reason or another, does not give a party, including the prosecutor, a right to freely portray a false picture of events." Ibid.

The prosecutor unfairly exploited the derelictions of defense counsel, which, along with the erroneous evidentiary ruling of the trial court, compounded the prejudice to Hannah.

VI.

We conclude that Hannah's "counsel's representation fell below an objective standard of reasonableness" and therefore Hannah has satisfied prong one of the Strickland/Fritz test. See Strickland, 466 U.S. at 687-88; Fritz, 105 N.J. at 52.

We also find that Hannah has satisfied prong two of the Strickland/Fritz test -- he has demonstrated, to a degree of reasonable probability, that but for counsel's deficiencies, the outcome of the trial would have been different. See Strickland, 466 U.S. at 694; Fritz, 105 N.J. at 52. In making the prejudice assessment, we cannot ignore that counsel's errors were magnified by mistakes made by the trial court and the prosecutor -- and perpetuated through various rounds of PCR proceedings.

Counsel's deficiencies deprived Hannah of his constitutional right to present a complete and credible third-party-guilt defense. One important

factor in analyzing whether the prejudice from counsel's ineffective performance denied Hannah a fair trial is the strength or weakness of the State's case. Unsurprisingly, "[a] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Pierre, 223 N.J. at 583 (quoting Strickland, 466 U.S. at 696); see also Gideon, 244 N.J. at 557 ("[A] conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt.").

Here, the credibility of the State's key witness, LaCue, who implicated Hannah in the shootings, was certainly at issue. LaCue, who admitted to shooting Flores in the head at near point-blank range, testified pursuant to a plea agreement that resulted in the dismissal of the murder charges against him, despite his central role in the double homicide. And LaCue had possession of the murder weapons and turned them over to the Prosecutor's Office. LaCue gave investigators multiple conflicting statements before he named Hannah as the second shooter. LaCue claimed that Hannah was sitting in the front passenger seat when he shot Salazar twice in the right side of the head at close range. But that account directly conflicted with the testimony of the State Medical Examiner's pathologist, who testified that Salazar was shot

only once and the bullet entered the left side of his head. Additionally, Salazar, unlike Flores, had no powder burns -- evidence suggesting either that the shot was not fired at close range or that the shot was fired through the driver's side window. In short, LaCue's testimony seemingly could not be squared with the forensic evidence. And even assuming that the shot that killed Salazar came from within the car, Hannah's defense was that he was not the shooter -- Thomas was Salazar's killer.

There were other weaknesses in the State's case. Hazel Forrester testified that, at 11:30 p.m. on the evening of the shootings, Hannah came to the apartment she shared with her sister Arlene and confessed to killing Salazar. But the shootings occurred at or after midnight. Moreover, Thomas was staying at the apartment that evening with his girlfriend Arlene -- who, according to Thomas's mother, later assisted Thomas in offloading the very same brand of heroin that the dead drug dealers were distributing. And, on the bloody piece of paper found in Salazar's pocket was Arlene's telephone number.

Everything considered, the State presented far from overwhelming evidence of Hannah's guilt.

On the other hand, Hannah -- who admitted that he was a drug dealer and had dealings with Salazar and Flores -- testified that LaCue and Thomas

51

were near the drug dealers' car at the time of the shootings and that he played no role in the killings. Hannah's third-party-guilt defense rose or fell based on his uncorroborated account. Deprived of the testimony of Lieutenant Redd and of Thomas's mother due to counsel's derelictions, the jury did not hear that (1) Thomas had paged the drug suppliers and arranged a drug deal; (2) Thomas's pager number was on a piece of paper in Salazar's pocket when Salazar was killed; (3) Thomas was concerned that police would find the piece of paper, which they did; (4) Thomas feared that Hannah would learn of a previous role he played in robbing money and drugs from one of Hannah's associates; (5) Thomas plotted to "set up" Hannah and to have him "take the weight" for one of the murders "to get him off his back"; (6) Thomas divided drug monies with LaCue; and (7) Thomas was later distributing the same brand of heroin taken from the drug dealers on the night of their murders.

That evidence undoubtedly lay at the heart of Hannah's right to present a complete defense, and indeed, its admission was necessary to ensure the basic fairness of his trial. We conclude that the combined errors in this case constitute a fundamental injustice that denied Hannah a fair trial. But for counsel's errors -- combined with those made by the trial court and prosecutor -- there is a reasonable probability that, had the jury heard the withheld evidence, the outcome of the trial would have been different.

To be clear, the issue is not whether the State presented sufficient evidence for the jury to return a guilty verdict, but whether Hannah was denied the opportunity to present a full defense -- to present evidence that would have allowed the jury to return a not-guilty verdict.

The passage of time alone cannot be a basis to bar relief to a defendant deprived of a fair trial because he was denied the opportunity to present a complete defense. This remedy may come late for Hannah, who was convicted twenty-seven years ago and has been toiling through the post-conviction relief process for fourteen years -- but it would be a far greater injustice if it never came at all.

## VII.

For the reasons expressed, we reverse the judgment of the Appellate Division, vacate Hannah's conviction, and remand for a new trial consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and PIERRE-LOUIS join in JUSTICE ALBIN's opinion. CHIEF JUSTICE RABNER also filed a concurrence. JUSTICE SOLOMON filed a dissent, in which JUSTICES PATTERSON and FERNANDEZ-VINA join.

State of New Jersey,

Plaintiff-Respondent/Cross-Appellant,

v.

Wilbert Hannah,
a/k/a Rabe,

Defendant-Appellant/Cross-Respondent.

CHIEF JUSTICE RABNER, concurring.

I join the majority's opinion in full. I write separately to ask the Committee on Evidence to examine whether N.J.R.E. 803(c)(25) should be amended.

N.J.R.E. 803(c)(25), an exception to the hearsay rule, currently provides as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against a defendant in a criminal proceeding only if the defendant was the declarant.

1

The majority ably explains the rationale for the rule -- that people do not readily admit to facts that can harm them, which renders their statements against interest trustworthy. See ante at ___ (slip op. at 43) (citing cases).

The federal counterpart to Rule 803(c)(25) contains an additional requirement. To be admissible, a statement must not only be against the declarant's interest but must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3) (emphasis added). The added language "applies to all declarations against penal interest offered in criminal cases." Id. at advisory committee's note to 2010 amendment.

The federal rule requires corroborating circumstances for a simple and sensible reason: to "assure[] both the prosecution and the accused that the Rule will not be abused and that only reliable hearsay statements will be admitted under the exception." Ibid.; see also McCormick on Evidence § 319(F) (8th ed. 2020) (discussing corroboration requirement).

I respectfully recommend that the Committee on Evidence consider whether a corroboration requirement should be added to N.J.R.E. 803(c)(25) for the same reason. I do not suggest that such a requirement would have had an effect in this case.

State of New Jersey,

Plaintiff-Respondent/Cross-Appellant,

v.

Wilbert Hannah,
a/k/a Rabe,

Defendant-Appellant/Cross-Respondent.

JUSTICE SOLOMON, dissenting.

Twenty-eight years ago, Angel "Freddy" Salazar and Luis Flores were shot to death in their car during a drug deal. Twenty-seven years ago, defendant Wilbert Hannah was convicted by a jury of felony murder,[1] armed robbery, and unlawful possession of a weapon. The jury concluded beyond a reasonable doubt that defendant and William LaCue -- who pled guilty and testified against defendant -- murdered Salazar and Flores while robbing them

---

[1] Pursuant to N.J.S.A. 2C:11-3(a)(3), felony murder is

> committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery . . . and in the course of such crime or immediate flight therefrom, any person causes the death of a person other than one of the participants.

1

of the drugs they intended to sell to defendant and LaCue. The jury acquitted defendant of purposeful and knowing murder.[2]

Twenty-seven years after defendant's jury trial and conviction, and following the exhaustion of his direct appeals, two petitions for post-conviction relief, several appeals, and four evidentiary hearings, the majority chooses to disregard all applicable procedural rules and accepts defendant's untimely ineffective assistance of counsel claim, raised for the first time before this Court. In doing so, the majority ignores critical evidence of defendant's guilt that was presented to the jury, and it creates a new standard for post-conviction relief. I therefore dissent.

## I.

It is important to review and consider evidence adduced at trial that is not mentioned and, presumably, not considered by the majority; that evidence undermines the majority's conclusion that the interests of justice require reversal of defendant's judgment of conviction. Specifically, the evidence undercuts the defense's claim that Rosa Flores did not know who "Rabb" was; that Salazar was shot from outside the car; that the Redd Report contained key

---

[2] Criminal homicide constitutes purposeful and knowing murder when "[t]he actor purposely causes death or serious bodily injury resulting in death," or "[t]he actor knowingly causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a)(1), (2).

2

information otherwise unavailable to the jury; and that the Redd Report[3] and certain excluded testimony was purely exculpatory.

First, defense counsel asserts, and the majority accepts, that the trial evidence established that Rosa Flores -- the wife of Salazar and sister of Luis Flores -- did not know who Rabb[4] was and said that she "never met or heard [defendant's] voice before." In fact, Rosa Flores testified at trial that her husband, Freddy, told her on the night he was murdered that if the phone rings "unless it's a guy named Rabb I'm not here"; someone named "Q"[5] called her home, to which she responded "we don't know any Q"; "Q" then passed the phone to someone who identified himself as "Rabb"; and, at that point, she gave the phone to Freddy. Rosa Flores also testified that prior to the night her husband and brother were murdered, she heard her brother Luis tell her husband Freddy "you have to be careful because Rabb is a stick-up kid." Thus, Rosa Flores not only knew who defendant was, but it was defendant -- not LaCue or Thomas -- who arranged the drug deal that became a robbery and double murder.

---

[3] The majority assumes, as the Appellate Division found, that defendant possessed the Redd Report.

[4] "Rabb" is defendant's street name.

[5] "Q" is LaCue's street name.

3

Next, defendant's version of the evidence, upon which the majority relies -- that the front-seat victim, Freddy Salazar, was shot at a forty-five-degree angle from outside the car -- is contradicted by the report of Investigator Lawrence Mullane and the testimony of Investigators Mark Appleyard and John Murphy, which revealed that there was a bullet hole in the front driver's side window and two bullet holes in the rear windows caused by shots fired from inside the vehicle; two ten-millimeter shell casings and three nine-millimeter shell casings were found inside the car; and all lead projectiles recovered were from the victims or outside the vehicle, including "a possible projectile impact mark" discovered on a garage door near the car's location. Other than bullet holes in the front and rear driver's side windows fired from within the car, the Mullane Report does not describe any projectile impact marks inside the car.

The majority's version of the evidence -- that the front-seat victim, Freddy Salazar, was shot at a forty-five-degree angle -- is subverted by the testimony of medical examiner Dr. Ernest Tucker, who testified on cross-examination that he "can only tell the direction relative to the victim's head" and that "[i]f his head was down . . . it, of course, alters, again, the position of the shooter." Though Dr. Tucker noted that "it's possible" that "given the angle" "the shooter could have been outside the automobile in which the

4

victim was seated," the unrefuted record evidence establishes that all the shots came from inside the car. Thus, counsel's argument that it was "simply not possible" for defendant to shoot Freddy Salazar from the front passenger seat is disingenuous.

Finally, counsel argued without any factual support in the record that there were "blue specks" from the car's interior roof in the wound of Freddy Salazar, revealing that he was struck by a bullet fired from a forty-five-degree angle from outside the car. Yet neither Freddy Salazar's autopsy report nor Dr. Tucker's testimony mentions the existence of "blue specks" in the victim's wound. Instead, both the autopsy report and Dr. Tucker's testimony mention the presence of pseudo-stippling -- little purple dots on the skin -- on the right side of Salazar's face, caused potentially by particles of unburned gunpowder; Salazar's wound was on the left side of his face. Additionally, although Dr. Tucker testified that the small marks could have been caused by glass shattering, no glass was found in the victim's wound or inside the vehicle; instead, shattered glass was found on the sidewalk outside the car, further indicating that the shots fired at Salazar came from within the car.

The majority also cites the Redd Report and the wrongfully excluded testimony of Mary Jones, Maurice Thomas's mother, as evidence supporting defendant's assertion of third-party guilt -- that Maurice Thomas fired a

weapon from outside of the car and killed Salazar.  In fact, the Redd Report did not contain significant evidence not disclosed to the jury, and Jones's testimony at a Rule 104 hearing held out of the presence of the jury also implicated defendant in the murders.

First, the majority acknowledges defendant's testimony that he, LaCue, and Thomas were drug dealers at the time of the murders; they all used the same drug suppliers; LaCue asked for defendant's help in getting more drugs to sell; several pagers were registered to defendant; and Thomas had one of those pagers.  There is no mention by the majority that Flores and Salazar were suppliers to defendant, Thomas, and LaCue, or that LaCue asked for defendant's help in getting more drugs to sell on the night of the murders.  The majority also ignores that, at trial, the State offered as an exhibit admitted into evidence the bloody piece of paper bearing pager numbers taken from one of the victims.  The fact that Thomas responded when one of the pager numbers on the paper was called  -- a fact on which the majority relies -- is merely consistent with defendant's testimony, not evidence of third-party guilt.

The majority also ignores portions of the Redd Report implicating defendant.  Specifically, the Redd Report summarizes Thomas's discussions with police and contains evidence that defendant coordinated the robbery and murders; that defendant had given the guns used "to LaCue for disposal"; and

6

that defendant planned to hide after the killings. In addition, the Redd Report states that defendant "liked to use strong arm force" and that Thomas told police defendant appeared at his apartment and stated that LaCue killed the victims. The Redd Report also identifies the victims as the source of the heroin that Thomas and defendant then sold and reveals that, once the victims agreed to deliver heroin to Jersey City rather than sell only from Brooklyn defendant "began to scheme to rob and kill them, so as to leave no witnesses."

In addition to Thomas's discussions with the police, the Redd Report also contains statements made by LaCue to police and to Thomas, inculpating defendant. Specifically, the Redd Report reveals that LaCue told Thomas defendant "finally wore him down and he agreed to assist in the attempt." It also contains LaCue's admission to police that he "assisted [defendant] in the killings of the victims," and that officers recovered the murder weapons following their interview with LaCue. Finally, the Redd Report states that "[i]nterviews of the victims' family" by investigators "revealed that shortly prior to their deaths, the victims had been contacted by Rabb," and the victims left Brooklyn, New York to deliver drugs to him.

Ignoring those facts, the majority emphasizes the prosecutor's closing remarks to the jury that "there is not a stich, a scintilla, a scintilla, a bit, an ounce, a piece of evidence" linking Thomas to the murder, and suggests that

7

in, listening to those remarks, the jury did not know that the victims had Thomas's pager number in their car. But the jury had as an exhibit the very pager numbers found on the victims and the jury listened to defendant testify that he gave one of the pagers -- one that was registered in his name -- to Thomas. In short, the Redd Report would not have provided the jury with any information it did not already have.

As to Jones's testimony at the Rule 104 hearing, while it implicated Thomas, it also implicated defendant and, like the Redd Report, supported his conviction for felony murder. For example, Thomas purportedly told Jones, "he just found out that . . . Rabb had helped LaCue," that "Rabb was involved," that "Rabb was with this kid LaCue and that Rabb had helped kill somebody." Indeed, Jones's testimony corroborates LaCue's and implicates defendant in the robbery and murder of Salazar and Flores.

Importantly, at the time of the Rule 104 hearing, Thomas[6] was in the county jail and available to testify at the hearing and at trial. He was not called, ostensibly for the same reasons the Redd Report was never used -- the Redd Report, Jones's testimony, and Thomas all inculpate defendant.

---

[6] Thomas was shot in the head and killed in Georgia in October 2000.

## II.

Our jurisprudence emphasizes "the constitutional mandate of a fair trial."  State v. Pierre, 223 N.J. 560, 577 (2015).  That constitutional right, of course, includes the "[a]ccess to the skill and knowledge of counsel," which "is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."  Ibid. (quoting Strickland v. Washington, 466 U.S. 668, 685 (1984)).  Thus, our "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Ibid. (quoting Strickland, 466 U.S. at 686).  In other words, a defendant must show "that counsel performed below a level of reasonable competence," and that there exists "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  State v. Fritz, 105 N.J. 42, 60-61 (1987) (quoting Strickland, 466 U.S. at 694).

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  State v. Castagna, 187 N.J. 293, 314 (2006) (quoting Strickland, 466 U.S. at 688-89).  Therefore, "[i]n determining whether defense

9

counsel's representation was deficient, '"[j]udical scrutiny . . . must be highly deferential," and must avoid viewing the performance under the "distorting effects of hindsight."'" State v. Arthur, 184 N.J. 307, 318-19 (2005) (quoting State v. Norman, 151 N.J. 5, 37 (1997)). Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of professional reasonable assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 319 (quoting Strickland, 466 U.S. at 689).

First, a defense decision not to use the Redd Report was "sound trial strategy." The Redd Report confirmed defendant's central role in the robbery and murder of Salazar and Flores. Indeed, in addition to the purposeful murder charges for which defendant was acquitted, defendant faced two counts of felony murder, two counts of armed robbery, and two counts of possession of a weapon for an unlawful purpose. Given its prejudicial nature, it would have been unreasonable for counsel to focus on the Redd Report hoping to blame Thomas for the killings, when the report emphasizes defendant's role in orchestrating the "scheme to rob and kill" the victims. Thus, we cannot conclude counsel was deficient in failing to use the Redd Report because it implicated defendant in the felony murder, robbery, and possession charges he faced. Use of the Redd Report by defense counsel, moreover, would

10

undoubtedly have prompted the State to call Detective Redd to testify at trial. In sum, choosing not to use the Report was "sound trial strategy." Castagna, 187 N.J. at 314 (quoting Strickland, 466 U.S. at 690).

Nevertheless, assuming counsel's decision not to use the Redd Report amounted to error, it is absurd to conclude that there exists a reasonable probability that had defense counsel used the report, "the result of the proceeding would have been different." Fritz, 105 N.J. at 60-61 (quoting Strickland, 466 U.S. at 694). Defendant testified that he sold drugs, had a relationship with the New York drug suppliers, was an associate of Thomas, and that he, Thomas, and LaCue all sold drugs in the neighborhood. Defendant testified that LaCue approached him because he had run out of drugs to sell, that LaCue contacted the New York drug dealers in his presence, and that, following LaCue's alleged conversation with the New York dealers, he and LaCue left "almost immediately" and went to the intersection of Lexington and Bergen Avenues. Once the New York dealers -- Salazar and Flores -- arrived, defendant testified that he, LaCue, and Thomas approached the car. Defendant claimed it was at that point that he walked away to talk to a woman on the corner while drinking a can of soda.

Salazar's wife, Rosa Flores, in large part corroborated defendant's testimony that LaCue contacted the New York dealers; although she testified

11

that after receiving a call from someone named "Q" and after telling the caller that "we don't know any Q," the caller passed the phone to someone who identified himself as "Rabb" before she passed the phone to Salazar. Flores further testified that she overheard Salazar say, "the car, two-door with my brother-in-law, just us two" and that she had overheard a prior conversation between the victims that referred to defendant as a "stick-up kid."

Other evidence included the numerous nine and ten-millimeter shell casings found within the vehicle; LaCue's testimony that he and defendant used nine and ten-millimeter handguns to carry out the killings and that defendant was worried he may have left a soda can with his prints in the victims' car; Hazel's testimony that defendant admitted to killing Fred; defendant's flight to Florida after the killings; Mark LaCue's testimony that his brother and someone named Rabb had "shot some Puerto Ricans"; and the red can of soda found inside the victims' vehicle. The jury heard that evidence, made its credibility determinations, and found defendant guilty. We fail to see how the Redd Report could have changed the trial outcome in any way other than further confirming defendant's role in the death of Salazar and Flores.

In ignoring this case's decades of litigated facts and our rules governing post-conviction relief, the majority concludes that failure to use the Redd

Report at trial constituted ineffective assistance of counsel, resulting in prejudice. The majority reaches that conclusion notwithstanding the fact that the Redd Report inculpates defendant, putting him at the scene and stating that it was defendant's plan "to rob and kill" the victims "so as to leave no witnesses." The majority also mistakenly concludes that there exists a "reasonable probability that, but for counsel's failure to use the Redd Report, the result of the proceeding would have been different." Ante at ___ (slip op. at 3-4) (citing Fritz, 105 N.J. at 60-61; Strickland, 466 U.S. at 694). But in stressing that defendant was "denied the opportunity to present a complete defense," the majority forces a conclusion that is at odds with the facts of this case and in conflict with decades of established precedent governing post-conviction relief. While there may have been a scintilla of evidence that Thomas had some involvement in the victims' murders, there is no evidence that undermines defendant's felony murder conviction. In sum, defendant was not denied the effective assistance of counsel.

### III.

For the same reason that defendant is unable to show ineffective assistance of counsel here, he is unable to demonstrate that the rules barring his request for post-conviction relief (PCR) must be relaxed to prevent a fundamental injustice.

13

A.

There are "procedural restrictions that apply to PCR applications," State v. Szemple, ___ N.J. ___, ___ (2021) (slip op. at 18), and this Court recognizes that "procedural bars to post-conviction relief exist 'in order to promote finality in judicial proceedings,'" State v. Goodwin, 173 N.J. 583, 593 (2002) (quoting State v. McQuaid, 147 N.J. 464, 483 (1997)); see also State v. Preciose, 129 N.J. 451, 474 (1992) (emphasizing the importance of enforcing our procedural rules to achieve finality and judicial efficiency). Indeed, "[a]s time passes, justice becomes more elusive and the necessity for preserving finality and certainty of judgments increases." State v. Afanador, 151 N.J. 41, 52 (1997).

Hence, Rule 3:22-12(a) explicitly bars initial petitions for post-conviction relief not filed within five years of entry of the challenged judgment of conviction, and Rule 3:22-4 (a) bars petitions that rely on grounds that could have been raised during direct appeal. Given the need for finality, that procedural bar "should be relaxed only 'under exceptional circumstances.'" Goodwin, 173 N.J. at 594 (quoting Afanador, 151 N.J. at 52). Such circumstances include a determination "that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice." R. 3:22-4(a)(2).

14

Second or subsequent petitions are subject to even more exacting standards. When, as here, such petitions assert that relief should be granted based on ineffective assistance of counsel, the petitions are barred unless they allege "a prima facie case of ineffective assistance of counsel that represented the defendant on the first or subsequent application for post-conviction relief." R. 3:22-4(b)(2)(C). Moreover, second or subsequent petitions for post-conviction relief must be timely under Rule 3:22-12(a)(2). See R. 3:22-4(b)(1). Such petitions are timely, as relevant here, if they are filed within one year after the latest of "the date on which the factual predicate for the relief sought was discovered, if that factual predicate could not have been discovered earlier through the exercise of reasonable diligence." R. 3:22-12(a)(2)(B).

Though post-conviction relief may be "the last opportunity for a defendant to challenge the veracity of a criminal verdict on constitutional grounds," Szemple, ___ N.J. at ___ (slip op. at 18), it is neither a substitute for direct appeal nor an opportunity to relitigate a case adjudicated on the merits, State v. Jones, 219 N.J. 298, 310 (2014) (citing R. 3:22-5). Furthermore, although we may relax procedural impediments to avoid fundamental injustice, doing so requires a careful balance of fairness and finality. State v. Martini, 187 N.J. 469, 481 (2006).

15

Defendant and the majority fail to explain why, after more than two decades, defendant's ineffective assistance of counsel claim premised on counsel's failure to use the Redd Report was not raised on direct appeal or during defendant's first or second PCR. Furthermore, defendant knew about the bloody piece of paper with the pager numbers and had both the transcript of the <u>Rule</u> 104 hearing and, as the majority acknowledges, the Redd Report. But rather than raise the claim in a timely manner, defendant instead waited to raise his ineffective assistance claim until after Thomas died and could not testify. That precisely is why "[a]s time passes, justice becomes more elusive" to the murder victims here. <u>Afanador</u>, 151 N.J. at 53; <u>see also</u> <u>Szemple</u>, ___ N.J. at ___ (slip op. at 3-4) (denying defendant's motion for post-conviction discovery forty-three years after the victim's murder and nearly thirty years after defendant's conviction).

B.

Also, a fundamental injustice occurs when the judicial system has failed to provide to defendants "'fair proceedings leading to a just outcome' or when 'inadvertent errors mistakenly impacted a determination of guilt or otherwise wrought a miscarriage of justice.'" <u>State v. Nash</u>, 212 N.J. 518, 546 (2013) (quoting <u>State v. Mitchell</u>, 126 N.J. 565, 587 (1992)). But nothing in this case suggests defendant was denied "fair proceedings leading to a just outcome" or

16

that defendant's trial was fraught with "inadvertent errors mistakenly impact[ing] a determination of guilt" or causing "a miscarriage of justice." Ibid.

Indeed, the State presented to the jury overwhelming evidence of defendant's involvement in the planning and execution of the drug deal culminating in two murders. That evidence included defendant's own testimony that LaCue approached him after running out of heroin to sell, and that he, LaCue, and Thomas met Freddy Salazar and Luis Flores the night they were murdered. It also included Rosa Flores's testimony that she was instructed by her husband not to speak to anyone but "Rabb," that someone called her house identifying themselves as "Q," and that after telling the caller "we don't know any Q," the caller handed the phone to someone who identified himself as "Rabb."

Furthermore, LaCue testified that he and defendant got into the victims' car, that defendant instructed the driver to park on Sackett Street, and then, instead of pulling out money to pay for the drugs, defendant pulled out a gun and shot Salazar twice. LaCue also testified that he shot the back-seat passenger, Flores, and that after fleeing the scene, he gave the guns used -- a nine-millimeter and a ten-millimeter -- to his brother Mark with instructions to get rid of them.

17

The jury also heard testimony from defendant's then girlfriend, Hazel Forrester, who testified that on the night of the killings, defendant came to the apartment that she shared with her sister, Arlene, and told Arlene that he had killed somebody named Fred. After hearing all of evidence admitted, the jury reached the sound conclusion that defendant was guilty of two counts of felony murder, two counts of armed robbery, and one count of possession of a handgun for an unlawful purpose. See id. at 541 ("A jury verdict that has been upheld on appeal 'should not be disturbed except for the clearest of reasons.'" (quoting State v. Ways, 180 N.J. 171, 187 (2004))). Accordingly, no "fundamental injustice" occurred here, and there is no clear reason to disturb the jury's verdict. See id. at 541, 546. I therefore dissent.